**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **TIVON NEALS,** | **Civil Action No. 16-7141(FLW)** |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **FRANCINE STROMBERG, et al.,** | |
| **Defendants.** | |

**FREDA L. WOLFSON, Chief U.S.D.J.**

This matter has been opened to the Court by three separate motions to dismiss Plaintiff

Tivon Neals' Second Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) brought by

Defendants Robert Alexander,[1] Daniel Cacicia, Robert Chetirkin, Salvatore D'Amico, Teresa

DeJesus, Mervin Ganesh, Jonathan Gramp, Jonathan Harris, Marcus Hicks, Christopher Jensen,

Cynthia Johnson ("C. Johnson"), Steven Johnson ("S. Johnson"), Gregory Kelley, Thomas

Kennedy, Gary Lanigan, William Lister, Timothy Maines, Robert Melendez, Bettie Norris, Brian

Patoe, Sean Patterson, Rory Payne, George Robinson, Gary Samosuk, Matthew Schlusselfeld,

David Sisnetsky, Jeffrey Soma, Francine Stromberg, and Daniel Williams (collectively "State

Defendants"). *See generally* ECF Nos. 70, 75, 80. The first motion to dismiss was filed on

behalf of all State Defendants except C. Johnson and Robert Alexander, who had not yet been

served. *See* ECF No. 70. Motions to dismiss by C. Johnson and Alexander followed. *See id.* at

75, 80. For the reasons explained in this Opinion, the motions to dismiss are granted in part and

denied in part.

---

[1] Robert Alexander was initially improperly pleaded as "Romel Alexander."

1

I.       **FACTUAL AND PROCEDURAL BACKGROUND**

a.  **Allegations in the Second Amended Complaint[2]**

1.  **The Inmate Legal Association**

Plaintiff is an inmate currently incarcerated at East Jersey State Prison in Rahway, New Jersey. ECF No. 66.  At all relevant times, Plaintiff was incarcerated at New Jersey State Prison (NJSP) in Trenton.  *See* generally ECF No. 25, Second Amended Complaint.  Plaintiff is a trained paralegal, and he is the former executive director of the Inmate Legal Association, Inc. (ILA).  *Id.* at ¶ 177.

The ILA is a nonprofit corporation that provides legal assistance to illiterate, indigent, non-English speaking, and mentally ill inmates, and it is comprised entirely of NJSP inmates who are trained as paralegals.  *Id.* at ¶ 192.  During his time with the ILA, Plaintiff provided "legal assistance, legal advice, and document preparation" to a minimum of one hundred (100) inmates per month.  *Id.* at ¶ 210.  Plaintiff was the ILA Secretary in 2013; Director in 2015; and the Executive Director from 2016 to 2018, a position which entailed the overall management of the organization, including ensuring that each member is properly trained in law and that meaningful legal access is afforded to all inmates in NJSP.  *Id.* ¶ 206.  Due to his membership in the ILA, and his political beliefs that inmates deserve legal assistance and access to the Courts, Plaintiff alleges he has been the "target" of an "onslaught of retaliatory actions" over a four-year period.  *Id.* at ¶ 215.

---

[2] For purposes of this motion to dismiss, the Court assumes the truth of all well-pleaded factual allegations in the Second Amended Complaint.  *See Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008).

### 2.   Allegations Against Defendants Robinson, Ganesh, Cacicia, Lister, Schlusselfeld, and Norris (Count One)

Plaintiff's duties as an ILA paralegal also include advocating for inmates housed in various forms of closed custody or solitary confinement, including inmates housed in NJSP's Management Control Unit ("MCU").  *Id.* at ¶ 216.  On June 18, 2014, he was assigned to assist twenty-four (24) such inmates with their scheduled review hearings.  *Id.* at ¶¶ 219– 20; ¶ 223.  The purpose of the hearings was to determine whether continued placement in the MCU was warranted.  *Id.* at ¶ 220.  Plaintiff was assigned to function as inmates' counsel- substitute.  *Id.* at ¶ 223.  Defendants Bettie, Norris, and Robinson served on the MCU Review Committee.  *Id.* at ¶ 222.  Prior to the inmates' review hearings, NJSP staff implemented "substantive changes" to its "classification and appeals process" and failed to provide the inmates with twenty-four (24) hours' notice of said changes.  *Id.* at ¶¶ 224–25.

Plaintiff's advocacy convinced Defendant Norris to permit rehearings for any inmate who desired one. *Id.* at ¶¶224-26.  Although the majority of the inmates waived their rights to a rehearing, eight inmates did not.  *Id.* at ¶ 227.  After Norris's ruling, Defendant Robinson advised Plaintiff: "You should be fired."  *Id.* at ¶ 228.  Defendant Robinson made this statement in an intimidating manner to dissuade Plaintiff from providing further assistance to inmates housed on the MCU, and to retaliate against him for protecting inmates' constitutional rights.  *Id.* at ¶ 229.  Defendant Norris heard Robinson's comments, but did not take any appropriate action.  *Id.* at ¶ 228.

The MCU Review Committee held the re-hearings on July 11, 2014.  *Id.* at ¶ 230.  The re-hearings took place in NJSP Housing Unit 4B at approximately 11 a.m.  *Id.* at ¶ 232. As Plaintiff entered the sally port, Defendant Robinson remarked: "It's you[;] you're gonna [sic] get fired today."  *Id.* at ¶ 233.  Robinson further remarked:  "See you at the [Classification]

Committee[,]" which is where inmates are assigned new prison jobs. *Id.* at ¶ 235.  Defendant

Norris again overheard Robinson's statements, but did not reprimand or admonish Robinson in

any way. *Id.* at ¶ 234.   Plaintiff entered the unit and presented his case as to why the remaining

eight inmates should no longer be housed on NJSP's MCU. *Id.* at ¶ 237.

Upon completion of the re-hearings, Plaintiff was detained and prevented from exiting

the housing unit. *Id.* at ¶ 238.  While he was detained, Defendants Lister and Schlusselfeld

conducted a "targeted search" of his cell pursuant to the order of Defendant Ganesh. *Id.* at ¶ 239

Defendant Cacicia placed him in handcuffs and escorted him to "prehearing disciplinary

confinement," where he was thereafter falsely charged with possessing contraband. *Id.* at ¶¶

241, 243, 249.  Plaintiff was charged with possessing two "immersion heating coils" that

Defendants Lister and Schlusselfeld concealed in his cell. *Id.* at ¶¶ 240, 250.  Defendant

Robinson allegedly ordered his placement in prehearing disciplinary confinement because such a

placement would serve as just cause for his firing from the ILA, thus carrying out the earlier

threats of termination. *Id.* at ¶ 243.  Defendant Robinson allegedly authorized these actions to

punish him for his "political expression" and his efforts to "bring about social change to inmates

housed in solitary confinement[.]" *Id.* at ¶¶ 244–45.  Defendant Norris's failure to reprimand

and/or supervise Robinson allegedly contributed to the infringement of his rights. *See id.* at ¶

247.

Plaintiff was ultimately found guilty of possessing contraband but was not given an

opportunity to present evidence in his defense. *Id.* at ¶ 252.  As a result of the discipline, he was

sentenced to ten (10) days of disciplinary confinement and sixty (60) days' loss of commutation

time. *Id.* at ¶ 253.  In addition, he was fired from his job with the ILA. *Id.* at ¶ 254.  The Second

Amended Complaint does not indicate whether Plaintiff appealed the disciplinary proceeding.

While Plaintiff was housed in disciplinary confinement, he was deprived of bottled water and was thus forced to drink contaminated tap water from the faucet in his cell. *Id.* at ¶¶ 261–64. On July 21, 2014, he was stricken with severe abdominal pain and required medical assistance. *Id.* at ¶¶ 267–68. He also had "bleeding in his intestinal tract[.]" Id. at ¶ 272. On August 6, 2014, NJSP medical personnel diagnosed him with unacceptable levels of the Helicobacter pylori bacterium, for which he was subsequently medicated. *Id.* at ¶¶ 273, 276. Prior to his time in prehearing disciplinary confinement, Plaintiff was a healthy individual; he suggests that the Helicobacter pylori must have been caused by the contaminated drinking water in his cell.[3] *Id.* at ¶ 277. The Unit on which he was housed during his prehearing disciplinary confinement was subsequently closed by Defendants Robinson, S. Johnson, and Maines, and Plaintiff alleges that they knew that the conditions of confinement "were beyond penological norms." *Id.* at ¶¶ 282–83.

### 3.  Allegations Against Defendants Payne, D'Amico, and Kennedy

On July 17, 2014, while he was still housed in disciplinary confinement, Senior Corrections Officer Thomas Foran came to his cell and requested a list of all the cases on which Plaintiff was working. *Id.* at ¶ 284. A few minutes later, Defendant Payne "shackled" him and escorted him to the property room, where his legal mail was stored. *Id.* at ¶ 286. Plaintiff describes both of these occurrences as very unusual. *See id.* at ¶¶ 285-86. Senior Corrections Officer Pamela Hill then informed Plaintiff that Defendants D'Amico and Kennedy had ordered her to seize his legal mail.[4] *Id.* at ¶ 287. Defendant Payne and an unknown officer then "forced"

---

[3] Plaintiff's ability to eat and quality of life have been substantially altered, and he suspects he has a peptic ulcer. *Id.* at ¶ 278. He was never seen by a medical doctor for his ailments, and was instead seen only by a nurse practitioner. *Id.* at ¶¶ 279–80. In addition, his requests for a change in diet and for an X-ray of his GI tract were both denied. *Id.* at ¶¶ 280–81.

[4] Neither SCO Foran nor SCO Hill are named as defendants in this action.

Plaintiff to turn over several manila envelopes containing legal mail from himself and other NJSP inmates. *Id.* at¶ 288. Defendant Payne did not provide him with an itemized seizure form, as required by NJDOC regulations. *Id.* at ¶ 289. Plaintiff infers that Defendants D'Amico and Kennedy, who had previously appeared visibly bothered by Plaintiff's advocacy at the Wing Representative Meetings,[5] *see id.* at ¶¶ 49-58, ordered the seizure of his legal mail to retaliate against him for his activity as an ILA paralegal and Wing Representative. *Id.* at ¶ 290. The seizure hindered Plaintiff's ability to prosecute a petition for writ of habeas corpus pending before the United States District Court. *Id.* at ¶ 293. One of the items seized was a letter showing he was entitled to discovery in the federal proceedings. *Id.* at ¶ 295. Plaintiff asserts that Defendants D'Amico, Kennedy, Payne, and John Doe Defendant # 4 acted in concert to deprive him of his constitutional rights. *Id.* at ¶¶ 297-299.

### 4. Allegations Against Defendants Somma, Melendez, Schlusselfeld, Cacicia, and Alexander

On December 7, 2015, Defendants Schlusselfeld, Melendez, and Somma searched the ILA's office space and seized several floppy discs and legal documents belonging to Plaintiff and other inmates. *Id.* at ¶¶ 302–03. These officers again failed to provide Plaintiff with a seizure form, as required by the pertinent regulations. *Id.* at ¶¶ 303–04. Plaintiff filed a grievance demanding the issuance of a seizure form and the return of any materials improperly seized. *Id.* at ¶ 306. The day after he filed the grievance, Defendants Schlusselfeld, Melendez, and Somma came to the ILA office to interrogate him. *Id.* at ¶ 307. The officers admitted to

---

[5] Plaintiff attended a Wing Representative Meetings in February and March 2014, which were also attended by Defendants D'Amico and Kennedy. At each meeting, Plaintiff raised specific issues about prisoners' rights to meaningful legal access and the use of problematic conditions of confinement, including solitary confinement and the use of dry cells. *See* Amended Complaint at ¶¶ 49-59. According to Plaintiff, Defendants D'Amico and Kennedy were "visibly bothered" by Plaintiff's advocacy. *See id.* at ¶¶ 55, 58.

seizing the floppy discs, but denied seizing any paper documents. *Id.* at ¶ 308. The officers returned the ILA's floppy discs later that afternoon. *Id.* at ¶ 311. A few hours after Defendants Schlusselfeld, Melendez, and Somma returned the ILA's floppy discs, Defendant Cacicia reported to Plaintiff's housing unit to inform him that he was again fired from his position with the ILA. *Id.* at ¶ 312. Plaintiff asserts that the timing of the firing suggested it was done as retaliation for his filing of a successful grievance. *See id.* at ¶ 313.

On December 12, 2015, an unnamed sergeant showed him a disciplinary charge for possession of gambling material. *Id.* at ¶ 317. According to Plaintiff, Defendants Schlusselfeld, Melendez, and Somma fabricated the charge as further retaliation for the grievance. *Id.* at ¶ 318. Plaintiff states that the charge ultimately could not be served on him, as it incorrectly listed his name as "Alonzo" Neals instead of Tivon Neals. *Id.* at ¶ 319. On December 14, 2015, Defendant Alexander prohibited him from attending the weekly ILA meeting. *Id.* at ¶ 320. According to the Second Amended Complaint, Defendant Alexander fired another inmate for refusing to provide information about the officers' retaliatory actions. *Id.* at ¶¶ 314–15. Alexander also made statements that he disliked Plaintiff because he was a paralegal, and Alexander "attempted to turn other inmates . . . against [him] by spreading knowingly false information[.]" *Id.* at ¶ 316.

On December 15, 2015, Plaintiff appeared for job reassignment by the Prison Classification Committee, which was chaired by Defendant C. Johnson. *Id.* at ¶ 322. Johnson informed Plaintiff that he was fired from the ILA due to the pending disciplinary charge for possessing gambling materials. *Id.* at ¶ 323. Plaintiff advised Defendant Johnson that the charge was never served on him, and was fabricated to retaliate against him for his grievance. *Id.* at ¶¶ 323–34. The charge was eventually dismissed. *Id.* at ¶ 325.

Plaintiff asserts that the "collective actions" of Defendants Somma, Melendez, Schlusselfeld, Cacicia, and Alexander also caused another inmate, Omar Saunders, to "lose a viable claim for relief" in his petition for habeas corpus.  *Id.* at ¶ 333.

### 5. Allegations Against Defendants Kelley, Patoe, S. Johnson, and C. Johnson

Meanwhile, on December 10, 2015, Defendant Kelley seized a book from Plaintiff's possession, entitled "Mastery" by Robert Greene; the book was not on any NJDOC lists of unauthorized material.  *Id.* at ¶¶ 336-37.  Nevertheless, Defendant Kelley allegedly implemented a "blanket ban" on all books authored by Robert Greene.  *Id.* at ¶ 338.  Plaintiff appealed Kelley's seizure of the book by writing a letter to NJSP Administrator Steven Johnson, but he failed to respond.  *Id.* at ¶339.  After "numerous attempts" to find out why the book was seized, Defendant Patoe informed him that the book was seized because it contained "'mind-controlling'" content.  *Id.* at ¶ 340.  Defendant C. Johnson similarly informed Plaintiff that the book was seized and banned due to its "content."  *Id.*  at ¶ 342.  Plaintiff alleges, however, that the above officials failed to comply with the pertinent regulations for banning objectionable content, and seized the book as retaliation for his filing of grievances and attempts to "bring about social change" as a paralegal for the ILA.  *Id.* at ¶ 346.

### 6. Allegations Against Defendants Stromberg, Sisnetsky, Williams, S. Johnson, C. Johnson, Chetirkin, and Maines

Between the years of 2014 and 2017, NJSP Supervisor of Education Francine Stromberg implemented a series of policies "collectively designed" to prevent Plaintiff from assisting other inmates with their legal matters.  *Id.* at ¶¶ 349–50.  First, in June 2015, Defendant Stromberg issued a memorandum decreasing inmates' access to the NJSP law library and ILA office by one hour per day.  *Id.* at ¶ 350.  This memorandum resulted in a greater number of inmates visiting Plaintiff at any given time, which in turn created an "overcrowded" and "hostile" working environment that dissuaded inmates from seeking legal assistance.  *Id.* at ¶ 350.

Second, in February 2016, Stromberg banned Plaintiff from continuing to teach basic research classes for prospective ILA members. *Id.* Plaintiff alleges Stromberg implemented this ban to retaliate against him for writing a letter concerning his job assignment to Defendant Cynthia Johnson. *Id.* Third, in June 2016, Stromberg closed three ILA offices, thus increasing problems of overcrowding in the remaining office space. *Id.* Plaintiff alleges Stromberg took this action to retaliate against him for writing a letter in which he voiced complaints about NJSP's courtline procedures. *Id.* Finally, Stromberg ordered Plaintiff to move furniture to facilitate the closing of one of the ILA offices. *Id.* Plaintiff alleges this order was designed to prevent him from engaging in ILA activities, including preparing legal documents and consulting with inmates. *Id.* Plaintiff asserts that Defendants S. Johnson, C. Johnson, Maines, Gramp, and Chetirkin knew about Stromberg's actions and failed to supervise and train her . *See id.* ¶¶ 352-53.

On July 5, 2016, Plaintiff provided Defendant Stromberg with a courtesy copy of the initial Complaint in this matter. *Id.* at ¶ 356. Plaintiff alleges that Defendant Stromberg "consulted with other named [D]efendants in this action", *id.*, and the following day, Defendants Gramp and Chetirkin ordered the closing of multiple ILA offices. *Id.* at ¶ 358. Plaintiff protested due to overcrowding concerns, stating inmates litigating confidential or sensitive subject matter would be less likely to seek the ILA's assistance, but Gramp and Chetirkin were "indifferent" to these concerns. *Id.* at ¶ 359.

Defendant Chetirkin "insisted" all ILA property to be moved into one single- room office, *id.* at ¶¶ 360–61, and Chetirkin and Ganesh thereafter threatened to fire Plaintiff and/or "ship[] [him] out of state" if he did not make the overcrowded office "look nice." *Id.* at ¶¶ 364–65.

Defendant Ganesh further threatened to fabricate evidence that would justify Plaintiff's shipment to an out-of-state facility, and Defendant Chetirkin heard Ganesh's statement, but took no appropriate action. *Id.* at ¶ 366. Defendant Chetirkin also ordered several items of ILA property to be thrown into the trash, including a desk; a cabinet; ILA training materials; "legal preparation" materials; and inmates' legal mail. *Id.* at ¶ 367. Plaintiff alleges that Defendants Steven Johnson, Cynthia Johnson, Jonathan Gramp, and Timothy Maines were all aware of Chetirkin's order, but did nothing to apprehend or discipline him. *Id.* at ¶ 368. Plaintiff alleges all of these actions were taken as retaliation for his filing of the instant civil lawsuit. *Id.* at ¶ 370.

Defendants Chetirkin, Sisnetsky, Ganesh, and Stromberg then seized "virtually all legal preparation materials" from an ILA office on July 8, 2016. *Id.* at ¶ 372. These materials included paper, staplers, staple removers, rubber bands, pencils, pens, highlighters, paper clips, chalk, brief clasps, envelopes, data disk holders, and an electric pencil sharpener. *Id.* These items donated to the ILA by Plaintiff and other inmates or purchased with money donated by Plaintiff and other inmates to prepare legal documents for filing. *Id.* at ¶ 374. Five days later, Defendant Chetirkin admitted to Plaintiff that he had seized the materials, explaining that he was "keeping [them] safe." *Id.* at ¶ 373. Plaintiff alleges that this seizure took place to frustrate and/or prevent him from litigating his current lawsuit. *Id.* at ¶ 377. He alleges that Administrator Steven Johnson and Defendants Gramp and Maines were aware of the seizure, but took no appropriate action to stop it. *Id.* at ¶ 375.

Finally, in August 2016, Plaintiff orally complained to Defendants Stromberg and Chetirkin about the ILA paralegals' lack of reasonable access to NJSP's MCU units. *Id.* at ¶ 378. In response to these complaints, Defendants Stromberg and Chetirkin eliminated all ILA access to three specific units. *Id.* at ¶ 379. When Stromberg and Chetirkin left their respective positions

at NJSP, Plaintiff  was again granted access to the MCU.  *Id.* at ¶ 380.  However, NJSP continues

to restrict such access for other ILA paralegals, thus further burdening Plaintiff.  *Id.*

### 7.  Allegations Against Defendants Jensen, DeJesus, Harris, and Patterson

Plaintiff also alleges several instances of interference with his outgoing and incoming

legal mail.  On October 29, 2016, Plaintiff was notified of an upcoming contact visit with two of

his family members.  *Id.* at ¶ 381.  He prepared two manila envelopes to give to his family

following the visit.  *Id.* at ¶¶ 382–86.  The envelopes contained both personal photographs and

legal documents.  *Id.* at ¶ 382.  Plaintiff states that he gave the envelopes to Defendant Jensen

prior to entering the NJSP visiting hall.  *Id.* at ¶ 386.  On the following day, Plaintiff learned that

his family did not receive the envelopes, and he filed an administrative grievance.  *Id.* at ¶¶ 387–

88.  On November 5, 2016, he had a second contact visit with the same two family members, and

he learned that they had received some but not all of the items contained in the two manila

envelopes.  *Id.* at ¶ 389.  Upon information and belief, Plaintiff asserts that Defendant Jensen

read and seized his legal mail in violation of N.J.A.C. 10A:3-6.1(a)(1), and in retaliation for

filing this action and "trying to bring about social change" as an ILA paralegal.  *Id.* at ¶¶ 391–93.

Plaintiff further states that Defendant Jensen's actions have interfered with his ability to litigate

this lawsuit.  *Id.* at ¶ 392.

Plaintiff alleges that on May 28, 2017, he was notified of a third contact visit with the

same two family members.  *Id.* at ¶ 397.  He prepared one manila envelope containing a district

court order and a Mother's Day card.  *Id.* at ¶ 398.  He followed Defendant DeJesus's

instructions and handed the envelope to Defendant Harris.  *Id.* at ¶ 401.  Plaintiff

alleges that his family again did not receive the envelope, and he filed administrative grievances

to which Defendant Patterson responded.  *Id.* at ¶ 402, ¶ 404.  Defendant Patterson provided "no

viable explanation" as to why the materials were seized, despite the fact that she is the supervisor

of NJSP's mailroom, and thus has "total control" over "incoming and outgoing mail." *Id.* at ¶ 405, ¶ 417. He alleges that the actions of Defendants DeJesus, Harrison, and Patterson were taken to retaliate against him for filing this lawsuit, and for "trying to bring about social change" as an ILA paralegal. *Id.* at ¶ 406.

On May 22, 2017, Plaintiff received correspondence from the American Civil Liberties Union ("ACLU"). *Id.* at ¶ 412. Before he received the correspondence, NJSP staff stamped the envelope with the words "Content Not Approved," indicating that an unknown prison official opened and read the correspondence outside of his presence. *Id.* at ¶¶ 412–13. Plaintiff filed an inquiry to identify the name of the official who opened and/or read the correspondence, and Defendant Patterson instructed him to file a request pursuant to the Open Public Records Act (OPRA), N.J.S.A. 47:1A-1 to -13. *Id.* at ¶ 414. Plaintiff thereafter filed an administrative grievance, and Patterson responded that no prison official had opened his mail. *Id.* at ¶ 416. Upon information and belief, Plaintiff alleges that Patterson directed the unknown prison official to open, read, and stamp the correspondence. *Id.* at ¶ 418.

### 8. Allegations Against Defendant Williams

Defendant Williams is a teacher at NJSP with "no formal training," and he is currently in charge of NJSP's legal access plan. *Id.* at ¶ 422. Plaintiff alleges that Williams was "influential" in Defendants Stromberg and Steven Johnson's reduction of NJSP inmates' "legal access" between the years of 2016 and 2018. *Id.* at ¶¶ 423–24. Plaintiff states that he previously complained about Williams' involvement in Stromberg's reduction of legal access, and Williams "continues to frustrate and impede" his access to the courts. *Id.* at ¶¶ 425–26. These frustrations and impediments include a June 2018 policy restricting the ILA's access to data disks used to print legal documents. *Id.* at ¶ 426. On several occasions throughout 2017,

Defendant Williams precluded Plaintiff from using computers in the NJSP law library. *Id.* at ¶ 427. William's conduct hindered Plaintiff's ability to research legal authority for a motion for leave to conduct discovery in his habeas petition. *Id.*

On April 13, 2017, Plaintiff and Deputy Attorney General ("DAG") Marvin Freeman were scheduled to have a telephone conference before the Honorable Tonianne J. Bongiovanni, U.S.M.J. *Id.* Defendant Williams arranged the conference and deliberately placed him in a room with a bad connection and a loudspeaker less than four (4) feet away, thus causing Judge Bongiovanni to "cut the call short" before he could offer his legal arguments. *Id.* Plaintiff further alleges that Williams refused to provide him with requested case law on October 4, 2017, but he received the case from another NJSP staff member some time thereafter. *Id.*

Plaintiff alleges that Defendant Williams took all of the above actions to "punish" him for his earlier complaints against Williams, and for "working in the ILA to bring about social change and to protect the Constitutional rights." *Id.* at ¶ 428. He also alleges that Williams acted in concert with Defendant Stromberg to deprive him of his right of access to the courts, and to deprive other similarly situated NJSP inmates of their rights of access to the courts. *Id.* at ¶ 429.

### 9.  Allegations Against Defendant Samosuk and Sisnetsky

Throughout 2017, Plaintiff was again assigned to function as counsel-substitute for numerous NJSP inmates charged with administrative disciplinary infractions. *Id.* at ¶ 431. While representing mentally ill inmates housed in closed custody, Plaintiff observed them to be subject to "deplorable living conditions[.]" *Id.* at ¶ 433. Plaintiff "consistently" complained that it was "cruel and unusual punishment" to keep inmates housed in such conditions, and he further complained that it was a denial of due process to deny them written notice of the disciplinary

charges against them.  *Id.* at ¶ 434.  Plaintiff "successfully overturned multiple adjudications of guilt" on these grounds.  *Id.* at ¶ 436.

In March 2017, Plaintiff was assigned to assist NJSP inmate Ivan McKinney in defending against a disciplinary charge written by Defendant Samosuk.  *Id.* at ¶ 438.  McKinney had filed a federal lawsuit against Defendant Samosuk, and he was shortly thereafter served with a disciplinary charge for "threatening[.]"  *Id.*  Plaintiff alleges that McKinney requested an in-person confrontation of Samosuk on March 31, 2017, but Disciplinary Hearing Supervisor Kevin Bezek[6] ordered Plaintiff to leave the hearing area when the confrontation was scheduled to take place.  *Id.* at ¶¶ 439–440.  Plaintiff asked Defendant Sisnetsky to call Sergeant Bezek, but Sisnetsky informed him he was "not needed" at McKinney's hearing.  *Id.* at ¶ 442.  Plaintiff was later approached by Defendant Samosuk, who stated he was "wasting his . . . time" and would soon be fired from the ILA.  *Id.* at ¶ 443.  Plaintiff states Samosuk threatened him to "coerce him into not effectively advocating for McKinney during the in-person confrontation."  *Id.* at ¶ 444.  Plaintiff further alleges that Defendants Samosuk and Sisnetsky's actions were taken to retaliate against him for "complaining about [NJSP] policies" and "providing meaningful assistance to inmates[.]"  *Id.* at ¶ 447.

### 10. Allegations Against Former NJDOC Commissioner Lanigan

Plaintiff alleges that former NJDOC Commissioner Gary Lanigan "used his authority over NJDOC to establish and maintain policies, customs, and practices that . . . caused agents, subordinates, and representatives under his command and control[] to harm and injur[e] [him]."  *Id.* at ¶ 453.

---

[6] Sergeant Bezek is not named as a defendant in Plaintiff's Second Amended Complaint.

First, Plaintiff alleges that in 2011, Defendant Lanigan introduced the "Corrective Action Form," which was an "alternative" to answering inmates' grievances, and led to a "customary practice" of NJDOC staff refusing to answer said grievances. *Id.* at ¶¶ 454–56. Plaintiff alleges that as a result of the Corrective Action Form, "most" inmate grievances are denied without a substantive answer. *Id.* at ¶ 457. Plaintiff alleges that Lanigan implemented the use of this form to deprive NJDOC inmates of meaningful administrative remedies and to "frustrate and impede" their rights of access to the courts. *Id.* at ¶ 458. Although the NJDOC's implementation of an electronic grievance system in 2015 coincided with a policy change that required staff to answer all grievances, Plaintiff alleges that Lanigan failed to train his subordinates on how to properly respond, thus perpetuating the previous practice of refusing to respond altogether. *Id.* at ¶¶ 459–61.

Plaintiff further alleges that in 2014, Defendant Lanigan created a class entitled "Inmate Manipulation." *Id.* at ¶ 463. Plaintiff alleges the purpose of the class was to teach NJDOC staff members to be "mistrustful and indifferent" to inmates' complaints and grievances. *Id.* at ¶ 464. He alleges that the class encouraged NJDOC staff to retaliate against inmates for speech protected by the First Amendment. *Id.* at ¶ 464.

Plaintiff also alleges Lanigan failed to establish policies that inform NJDOC staff of the restrictions against "at will seizure" of inmates' legal mail and other personal items. *Id.* at ¶ 465. Plaintiff alleges that this particular lack of guidelines has caused him constitutional harm. *Id.* at ¶ 467.

On April 1, 2017, Plaintiff wrote a letter to Defendant Lanigan to request him to "constrain staff in NJSP from punishing inmates for using the remedy system and filing lawsuits." *See* ECF No. 25 at 130-131. Plaintiff's letter described his alleged retaliatory firing

from the ILA by Defendant Samosuk.  Plaintiff also informs Defendant Lanigan that such

retaliation against ILA paralegals has become "customary at NJSP."  *See id.* at 144. On January

15, 2018, Plaintiff wrote again to Defendant Lanigan regarding alleged First Amendment

retaliation by Defendant Stromberg in connection with the closing of the ILA offices.

Finally, Plaintiff alleges that all twenty-nine (29) defendants named in his Second

Amended Complaint have "acted in concert" to create "one continuous retaliatory act spanning a

four-year period" during which he has received "almost daily reprisals, threats, and

intimidation[.]"  *Id.* at ¶ 470.  He alleges that Defendant Lanigan contributed to these harms by

failing to adequately supervise the NJDOC officials under his command, and by directly or

indirectly creating the customs and policies which resulted in NJSP's "systemic retaliation"

against him.  *Id.* at ¶ 472.

### 11. Allegations Against Current NJDOC Commissioner Hicks

In addition to maintaining several of Defendant Lanigan's policies delineated above, *see*

*id.* at ¶¶ 457, 476, Plaintiff alleges that current NJDOC Commissioner Hicks retaliated against

him in June 2018.  *Id.* at ¶¶ 478–84.   On June 1, 2018, Plaintiff sent Commissioner Hicks a letter

complaining that many of the former Commissioner's "policies, customs, and practices" were

influenced by unlawful retaliation.  *Id.* at ¶ 478.  Four days later, Commissioner Hicks authorized

a further reduction of NJSP's legal services, which included further limiting access to copiers

and printers, and reducing access to legal research from seven-and-a-half hours per weekday to

five-and-a-half hours per weekday.  *Id.* at ¶ 479.   Based on the timing, Plaintiff asserts that

Commissioner Hicks' actions were "substantially motivated" by his letter, and these actions

reduced Plaintiff's ability to provide "meaningful legal assistance" to other inmates.  *Id.* at ¶¶

480–81.  Plaintiff also avers that he is in danger of losing his pending petition for post-conviction relief as well as this civil lawsuit.  *Id.* at ¶ 483–84.

### 12. The Legal Counts and the Relief Requested

Plaintiff's Second Amended Complaint asserts eleven (11) legal counts arising under 42 U.S.C. § 1983 and/or the New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2.  *See* ECF No. 25 at 68–78, ¶¶ 484-541.  Count One alleges First Amendment retaliation by Defendants Robinson, Ganesh, Cacicia, Lister, Schlusselfeld, and Norris, *id. at* ¶¶ 485–93; Count Two alleges First Amendment retaliation by Defendants Payne, D'Amico, and Kennedy, *id.* at ¶¶ 494–97; Count Three alleges First Amendment retaliation by Defendants Somma, Melendez, Schlusselfeld, Cacicia, and Alexander, *id.* at ¶¶ 498–503; Count Four alleges First Amendment retaliation by Defendants Kelley, Patoe, S. Johnson, and C. Johnson, *id.* at ¶¶ 504–07; Count Five alleges violations of his First Amendment rights to expression and association by Defendants Kelley, Patoe, S. Johnson, C. Johnson, Lanigan, and Hicks, *id.* at ¶¶ 508–09; Count six alleges First Amendment retaliation by Defendants Stromberg, Sisnetsky, Williams, Steven Johnson, C. Johnson, Chetirkin, and Maines, *id.* at ¶¶ 510– 14; Count Seven alleges First Amendment retaliation by Defendants Jensen, DeJesus, Harris, Samosuk, and Patterson, *id.* at ¶¶ 515–18; Count Eight alleges due process violations by Defendants Payne, D'Amico, Kennedy, Stromberg, Sisnetsky, Williams, Chetirkin, Somma, Melendez, Schlusselfeld, Jensen, DeJesus, Harris, and Patterson, *id.* at ¶¶ 519–21; Count Nine alleges failure to train, supervise, or discipline by Defendants Lanigan, Norris, S. Johnson, Gramp, Chetirkin, Maines, and Hicks, *id.* at ¶¶ 522–30; Count Ten alleges the implementation of unconstitutional policies, customs, and practices by Defendants Lanigan, Norris, S. Johnson, Gramp, Chetirkin, Maines, and Hicks, *id.*

at ¶¶ 531–35; and Count Eleven seeks injunctive relief from all twenty-nine named defendants, *id.* at ¶¶ 536–45.

In addition to the preliminary and permanent injunctive relief demanded in Count Eleven of his Second Amended Complaint, Plaintiff seeks compensatory damages, punitive damages, reimbursement for his costs of suit, and any other relief the court deems just. *See id.* at 79. Plaintiff demands a trial by jury on all issues. *Id.* at 80.

### b. Procedural History

Plaintiff's forty-two page Amended Complaint was filed in New Jersey Superior Court, Law Division, Mercer County, and the matter was removed by Defendant Gary Lanigan and the New Jersey Department of Corrections ("NJDOC") on October 13, 2016. *See* ECF Nos. 1, 1-1. Defendants filed their Answer on October 28, 2016, ECF No. 4, and Plaintiff subsequently sought a stay to exhaust his administrative remedies, ECF No. 14, which was granted by the Magistrate Judge on July 11, 2017. *See* ECF No. 15. The matter was subsequently administratively terminated on October 24, 2017. ECF No. 16.

On August 3, 2018, Plaintiff filed a motion for leave to file a Second Amended Complaint together with a 80-page 545 paragraph Second Amended Complaint with attachments. *See* ECF Nos. 18, 18-2. The Magistrate Judge granted the motion to amend and reopened the matter. *See* ECF No. 24. Plaintiff's Second Amended Complaint was docketed on October 24, 2018, and, due to issues serving the newly-added Defendants, State Defendants sought several extensions of time within which to file their Answer or move to dismiss, which were granted by the Magistrate Judge. *See* ECF Nos. 27, 29-30, 42, 54, 56.

On July 11, 2019, Plaintiff notified the Court that he had been transferred to East Jersey State Prison. *See* ECF No. 66.

On August 11, 2019, State Defendants, with the exception of C. Johnson and Alexander, filed their motion to dismiss in part the Second Amended Complaint.  *See* ECF No. 70. Subsequently, on September 9, 2019, Cynthia Johnson filed a motion to dismiss the Second Amended Complaint.  ECF No. 75.  Finally, on December 13, 2019, Robert Alexander filed a motion to dismiss the Second Amended Complaint.  ECF No. 80.  Plaintiff then filed his opposition on February 21, 2020, and State Defendants filed a reply on March 14, 2020.  The motions were administratively terminated due to confusion over whether Robert Alexander was the individual Plaintiff intended to sue; once it was determined that he was the correct individual, the motions were deemed refiled on March 20, 2020.  *See* ECF No. 85.  The motions are fully briefed and ready for adjudication.

## II.    <u>STANDARD OF REVIEW</u>

In resolving a motion to dismiss for failure to state a claim, under Rule 12(b)(6), "'courts accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief.'"  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)); *see also Zimmerman v. Corbett*, 873 F.3d 414, 417–18 (3d Cir. 2017), *cert. denied* 138 S. Ct. 2623 (2018); *Revell v. Port Auth. of N.Y. & N.J.*, 598 F.3d 128, 134 (3d Cir. 2010).

As a pro se litigant, Plaintiff is entitled to liberal construction of his complaint.  *See Liggon–Redding v. Estate of Sugarman*, 659 F.3d 258, 265 (3d Cir. 2011).  To survive dismissal under Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.*

### III.   DISCUSSION

State Defendants' motions seek dismissal of Plaintiff's Second Amended Complaint in

part pursuant to Fed. R. Civ. P. 12(b)(6).[7]  As outlined below, Plaintiff asserts numerous civil

rights claims against twenty-nine prison officials, and the Court considers Plaintiff's claims

under 42 U.S.C. § 1983 together with his claims under the New Jersey Civil Rights Act

("NJCRA").

#### a.   Official Capacity Claims for Damages

All Defendants seek dismissal of the damages claims against them in their official

capacities. *See* Second Amended Complaint at ¶¶ 12–42.  To the extent that Plaintiff brings

claims for damages under § 1983 and/or the NJCRA against Defendants in their official

capacities, such claims are dismissed with prejudice. *See Hafer v. Melo*, 502 U.S. 21, 27 (1991)

(citing *Will v. Michigan Department of Police*, 491 U.S. 58, 71 (1989).

#### b.   First Amendment Retaliation Claims

The gravamen of Plaintiff Complaint is that State Defendants retaliated against him due

to his advocacy on behalf of other inmates as a ILA paralegal, his filing of grievances, and his

filing of this lawsuit, and that the supervisory Defendants acquiesced to this misconduct and/or

created an environment which such violations would occur.  State Defendants seek dismissal of

the bulk of Plaintiff's First Amendment Retaliation Claims (Counts One, Two Three, Four, and

---

[7] The Court considers only the claims addressed in Defendants' motions to dismiss and State
Defendants have largely limited their analysis to the eleven counts listed in the Amended
Complaint.  To the extent Defendants have failed to address claims asserted in the Second
Amended Complaint, the Court makes no determinations about the viability of those claims in
this decision unless otherwise noted.

Seven) of the Second Amended Complaint for failure to state a claim of First Amendment retaliation against any of the Defendants named therein. *See* State Defendants' Brief at 28-42; *see also* C. Johnson Brief at 16-21; Alexander Brief at 11-15.

In order to state a prima facie case of First Amendment retaliation, a prisoner must plausibly allege that: (1) he engaged in constitutionally protected conduct; (2) he suffered an adverse action sufficient to deter a person of ordinary firmness from exercising his constitutional rights; and (3) the constitutionally protected conduct was "a substantial or motivating factor" for the adverse action. *See Rauser v. Horn*, 241 F.3d 330, 333 (3d Cir. 2001).

### 1. Count One—First Amendment Retaliation

In Count One, Plaintiff alleges that Robinson, Ganesh, Cacicia, Lister, Schlusselfeld, and Norris retaliated against Plaintiff due to his role as ILA paralegal/counsel substitute for MCU inmates.  In June 2014, Plaintiff appeared before the MCU Review Committee to function as counsel-substitute and assist inmates housed on the MCU with their placement review hearings. *See* ECF No. 25 at ¶¶ 216–23.  As a result of Plaintiff's advocacy, Defendant Norris ordered that any inmate who desired a re-hearing would receive one, *id.* at ¶¶ 224–26, and Defendant Robinson advised him: "You should be fired."  *Id.* at ¶ 228.  Plaintiff infers that Defendant Robinson made this comment to intimidate Plaintiff, to dissuade him from providing further assistance to inmates housed on the MCU, and to retaliate against him for protecting other inmates' constitutional rights.  *Id.* at ¶ 229.  After the re-hearings took place, Defendant Cacicia placed him in pre-hearing disciplinary confinement while Defendants Lister and Schlusselfeld searched his cell under orders from Defendant Ganesh.  *Id.* at ¶¶ 238–42. He was thereafter charged with an administrative disciplinary infraction for possessing contraband, and was ultimately adjudicated guilty of that charge.  *Id.* at ¶¶ 249–52.  As a result of the discipline, he

was sentenced to ten (10) days of disciplinary confinement, sixty (60) days' loss of commutation time, and he was temporarily fired from his job with the ILA. Id. at ¶¶ 253–54.  Plaintiff asserts that Defendants Robinson, Ganesh, Cacicia, Lister, Schlusselfeld, and Norris's actions were designed to "chill his protected speech" and to retaliate against him for providing "meaningful legal assistance" to inmates housed on the MCU.  *See id.* at ¶¶ 485–93.

State Defendants first argue that Plaintiff does not have a constitutional right to a particular housing assignment or a prison job with the ILA and therefore "cannot show that he was retaliated against for engaging in constitutionally protected activity, as is required under the first prong of a retaliation claim."  *See* Defendants' Brief at 32 (citations omitted).  Plaintiff's placement in disciplinary segregation and the loss of his prison job, however, are not "protected conduct" but rather the adverse actions that he suffered as a result of his protected conduct. *See Rauser*, 241 F.3d at 333.  Furthermore, in a First Amendment retaliation claim, the relevant question is not whether Plaintiff has a protected liberty interest in the privileges he was denied, but whether he was denied those privileges in retaliation for exercising a constitutional right.  *See Rauser*, 241 F.3d at 333.  In *Allah v. Seiverling*, 229 F.3d 220, 224–25 (3d Cir. 2000), the Third Circuit held that "government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for the exercise of a constitutional right." (quoting *Thaddeus–X v. Blatter*, 175 F.3d 378, 386 (6th Cir. 1999) (en banc)). Thus, a prisoner litigating a retaliation claim need not prove that he had an independent liberty interest in the privileges he was denied. *See Rauser*, F.3d at 333.

Thus, although Plaintiff has no constitutional right to his job, *Rhodes v. Chapman*, 452 U.S. 337, 348 (1981), and no constitutionally protected liberty interest in being incarcerated in

any particular prison, *see Olim v. Wakinekona*, 461 U.S. 238, 245 & n. 6, (1983), retaliation for the exercise of his constitutional right is itself a violation of the Constitution. *See White v. Napoleon*, 897 F.2d 103, 111–12 (3d Cir. 1990).  Furthermore, the Third Circuit has expressly held that "termination of prison employment constitutes adverse action sufficient to deter the exercise of First Amendment rights, satisfying the second element of a retaliation claim at [the motion to dismiss] stage of the litigation." *Wisniewski v. Fisher*, 857 F.3d 152, 157 (3d Cir. 2017) (citations omitted) (finding that amended complaint also adequately alleged a causal link between his provision of legal assistance and his job removal).  Likewise, in *Allah v. Seiverling*, 229 F.3d at 225, the Third Circuit found that placement in administrative segregation may be sufficient to deter a person of ordinary firmness from exercising his or her First Amendment depending upon the facts of the case. *See id.* (finding that allegations that plaintiff was kept in administrative segregation for several months where he had reduced access to phone calls, reduced access to the commissary, reduced access to recreation, confinement in his cell for all but five hours per week, denial of access to rehabilitative programs and, significantly, inadequate access to legal research materials and assistance was sufficiently adverse).  For these reasons, the Court denies the motion to dismiss as to this issue.[8]

Defendants next argue that Plaintiff First Amendment retaliation claims in Count One are barred under *Heck v. Humphrey*, 512 U.S. 477 (1994), and *Edwards v. Balisok*, 520 U.S. 641, 646–47 (1997).  In *Heck*, the Supreme Court held that a prisoner may not pursue a § 1983 action which necessarily impugns the validity of the conviction or duration of sentence, unless first demonstrating that the conviction or sentence has already been invalidated. *Heck*, 512 U.S. at

---

[8] The Court need not determine whether Plaintiff states a separate claim under the Eighth Amendment for his conditions of confinement in administrative segregation as Defendants have neither construed nor moved to dismiss this claim.

486–87.  The Court extended *Heck's* "favorable termination" rule to prison disciplinary sanctions which alter the duration of a prisoner's term of incarceration.  *Edwards*, 520 U.S. at 646–48.  The rule does not, however, bar a prisoner from bringing an action which does not implicate the fact or duration of confinement.  *See Muhammad v. Close*, 540 U.S. 749, 751 (2004); *Peralta v. Vasquez*, 467 F.3d 98, 104 (2d Cir.2006).  The effect of disciplinary proceedings on good-time credits is a matter of state law or regulation.  *See id.* at 754.

At issue is whether a favorable outcome on Plaintiff's First Amendment retaliation claims would necessarily imply the invalidity of Plaintiff's underlying conviction or sentence and is thus barred under *Heck* or *Edwards*.  The Court declines to decide this issue without the full record and adequate briefing.  Notably, Defendants assert that success on Count [One] would "invalidate Plaintiff's disciplinary sanction if proven true", *see* Defendants' Brief at 33, but, as clarified by the Supreme Court in *Muhammed v. Close*, 540 U.S. at 751 n.1, the sentence that matters for *Heck* is the sentence ordered by the original judgment of conviction, and not the disciplinary sentence.  Furthermore, Plaintiff does not directly challenge the disciplinary proceeding by asserting a claim for denial of due process and has alleged multiple adverse actions resulting from the alleged retaliation.  Defendants have not cited any decisions from the Third Circuit applying *Heck* under these circumstances.

Plaintiff lost 60 days of commutation time, received 10 days of disciplinary confinement, and lost his job with the ILA.[9]  The only sanction that could necessarily affect the length of

---

[9]  There is a circuit split regarding whether *Heck* applies in so-called mixed sanction cases.  *See Peralta v. Vasquez*, 467 F.3d 98, 104 (2d Cir. 2006) (holding that a prisoner facing condition-of-confinement sanctions and duration-of-confinement sanctions could challenge the former under § 1983 without complying with *Heck's* favorable-termination requirement if prisoner agreed to waive any claim to a shortened sentence) with *Haywood v. Hathaway*, 842 F.3d 1026, 1030 (7th 2016)(explaining that the approach taken in *Peralta* is incompatible with *Heck* and its successors).

Plaintiff's incarceration is the loss of commutation time, which is governed by N.J.A.C. 10A:9-5 et. seq, and Defendants have not explained how the loss of commutation credits affects the length of Plaintiff's particular sentence, if at all.[10]  For these reasons, Defendants are free to raise this issue again on summary judgment with the full record and appropriate briefing of the legal issues, but the Court will deny without prejudice the motion to dismiss on the basis of *Heck* at this time.

### 2.  Count Two—First Amendment Retaliation

With respect to the First Amendment retaliation claims asserted in Count Two, State Defendants that Plaintiff's conduct as an ILA paralegal and/or an NJSP wing representative is not constitutionally protected activity.  *See* Defendants' Brief at 43.  In *Wisniewski v. Fisher*, 857 F.3d at 156–57, however, the plaintiff alleged that as an Inmate Legal Reference Aide, he was responsible for assisting inmates assigned to his caseload prepare legal documents, including grievances, and in performing those duties, he obtained a copy of a draft grievance to use in assisting his assigned inmate to prepare a grievance challenging the prison's yard policy. The plaintiff further alleged that when prison officials discovered that this material belonged to a notoriously litigious inmate and was used in the filing of multiple other grievances challenging

---

[10] In *Thomas v. Eby*, 481 F.3d 434, 438–40 (6th Cir. 2007), for instance, a prisoner-plaintiff filed a § 1983 suit alleging that a prison guard filed a misconduct report against him in retaliation for the prisoner having filed an earlier grievance against another correctional officer and sought to have the misconduct finding set aside and be awarded damages. *See id.*  The government argued that the prisoner's loss of credits necessarily lengthened his sentence and, therefore, the § 1983 suit was barred by *Heck*. *Id.*  The Sixth Circuit, recognizing that the effect of disciplinary proceedings on good-time credits is a matter of state law or regulation, consulted Michigan law and determined that the credits did not determine when a sentence expired or was completed, but only when a prisoner was subject to parole or discharge. *Id.* Thus, the court found that success in the § 1983 suit would not necessarily affect the duration of the prisoner's sentence because prison officials retained discretion regarding whether to grant him parole, and *Heck*, therefore, did not bar the § 1983 suit. *See id.*

the same policy, they contrived misconduct charges, of which he was ultimately cleared, and

engaged in a series of retaliatory actions, including arranging for his removal from his law

library position.  *Id.*  The Third Circuit held that the plaintiff's "amended complaint plausibly

alleged that his conduct in assisting his assigned inmate prepare a grievance, which was both

pursuant to his job duties and in accordance with prison regulations, was not inconsistent with

legitimate penological interests, and therefore could fall within the limited First Amendment

rights that prisoners retain."  *See id.*  (citing *Johnson v. Avery*, 393 U.S. 483, 486-90 (1969)

(protecting the right of access to courts by prohibiting state prison officials from actively

interfering with inmates' attempts to prepare legal documents).  Because Defendants do not

address the reach of *Wisniewski*, the Court finds that Plaintiff has sufficiently alleged at this early

stage that his advocacy was undertaken in connection with his ILA and related job duties[11] and

denies the motion to dismiss on this issue.

       State Defendants also assert that Count Two of the Complaint should be dismissed for

failure to allege a causal link between Plaintiff's protected activity and the adverse action. "To

establish the requisite causal connection a plaintiff usually must prove either (1) an unusually

suggestive temporal proximity between the protected activity and the allegedly retaliatory action,

or (2) a pattern of antagonism coupled with timing to establish a causal link." *See Lauren W. ex*

*rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (quoting *Krouse v. American*

*Sterilizer Co.*, 126 F.3d 494, 503–04 (3d Cir. 1997)); *see also Wisniewski*, 857 F.3d at 157 n. 4

---

[11] In an unpublished decision, the Third Circuit draws a distinction between inmates providing
legal assistance to other inmates pursuant to their job duties and those who simply provide such
assistance in the absence of any duty.  *See, e.g.*, *Watlington on behalf of FCI Schuylkill African*
*American Inmates v. Reigel*, 723 F. App'x. 137, 140 (3d Cir. 2018) (affirming dismissal of
retaliation claim where the plaintiff alleged that he was retaliated against for providing legal
assistance to other inmates but did not allege that he was providing any such assistance pursuant
to his job duties in the prison).

(stating that a prisoner-plaintiff asserting First Amendment retaliation must adequately allege facts to support causation at the pleading stage).

Plaintiff, however, asserts in the Second Amended Complaint that he attended a Wing Representative Meetings in February and March 2014, which were also attended by Defendants D'Amico and Kennedy.  At the meetings, he raised issues about prisoners' rights to meaningful legal access and conditions of confinement.  *See* Second Amended Complaint at ¶¶ 49-59. Defendants D'Amico and Kennedy were "visibly bothered" by Plaintiff's advocacy.  *See id.* at ¶¶ 55, 58.  Subsequently, in July 2014, Defendants D'Amico and Kennedy ordered Payne and another officer to seize Plaintiff's legal mail, and neither Payne nor the other officer provided him with an itemized seizure form, as required by NJDOC regulations.  *Id.* at ¶¶ 286–89. Plaintiff alleges that Defendants Payne, D'Amico, and Kennedy's actions were taken to retaliate against him for "complaining about prison conditions and trying to bring about social change as an ILA paralegal and wing representative."  *Id.* at ¶ 290.

Here, the Court finds that Plaintiff's has provided sufficient facts at this early stage showing the required causal connection between his protected activity and the adverse action. The Court will deny the motion to dismiss the First Amendment retaliation claim as to these Defendants.

### 3.   Count Three—First Amendment Retaliation

State Defendants next argue that Count Three asserting First Amendment retaliation against Defendants Schlusselfeld, Melendez, Somma, and Cacicia should be dismissed for failure to state a claim for relief.  Defendant Alexander likewise seeks dismissal of Count Three.

In Count Three, Plaintiff alleges that Defendants  Schlusselfeld, Melendez, and Somma fabricated a disciplinary charge against him in retaliation for his grievance against them for the

seizing floppy discs and legal documents from the ILA office space, Second Amended

Complaint at ¶¶ 317-18, and Defendant Cacicia fired Plaintiff from his ILA job immediately

thereafter. *See id.* at ¶ 312. Defendant Alexander then prohibited him from attending a weekly

ILA meeting, *id.* at ¶ 320, and Defendant C. Johnson also informed him he was temporarily

fired from the ILA due to the pending disciplinary charge. *Id.* at ¶ 323.

A prisoner's ability to file grievances and lawsuits against prison officials is a

constitutionally protected activity for purposes of a retaliation claim. *See Milhouse v. Carlson*,

652 F.2d 371, 373–74 (3d Cir. 1981); *Mitchell v. Horn*, 318 F.3d at 530; *Watson v. Rozum*, 834

F.3d 417, 422 (3d Cir. 2016). Plaintiff has provided sufficient facts in the Second Amended

Complaint that Defendants Schlusselfeld, Melendez, and Somma fabricated a disciplinary charge

against Plaintiff in retaliation for Plaintiff's filing of a grievance. Defendant Cacicia's

involvement in the fabrication of the disciplinary charge and the retaliatory firing is less clear,

but at this early stage, the Court will permit the First Amendment claim against him to proceed

as well.

Plaintiff's allegation that he was falsely charged with misconduct in retaliation for filing

a grievance against them may state a cognizable First Amendment retaliation claim. *See*

*Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003). Defendants' arguments that the disciplinary

charges were eventually dismissed or that Plaintiff's second firing was too short to amount to an

adverse action are not based on any controlling decisions and are unconvincing, particularly at

this early stage of the proceedings. The Court will deny the motion to dismiss as to Defendants

Schlusselfeld, Melendez, Somma, and Cacicia on Count Three.

The Court will grant Robert Alexander's motion to dismiss as to Count Three. Plaintiff

alleges that Defendants Schlusselfeld, Melendez, and Somma fabricated the charge, and

Defendant Cacicia removed him from employment.  He alleges nothing to suggest that Defendant Alexander was involved with either of these decisions.  *See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (explaining that each defendant in a § 1983 action must have had "personal involvement" in the alleged wrongdoing).  Plaintiff's allegations that Defendant Alexander fired another inmate for refusing to cooperate with an investigation, *see* Second Amended Complaint at  ¶¶ 314-15, and that Alexander stated he dislikes Plaintiff and "attempted to  turn  other inmates . . . against [him]" by spreading rumors, *id.* at ¶ 316 are insufficient to meet the adverse action and causation elements of a First Amendment retaliation claim.

### 4.  Count Four—First Amendment Retaliation

State Defendants next argue that Count Four of the Second Amended Complaint, which asserts First Amendment retaliation claims against Defendants Kelley, Patoe, C. Johnson, and S. Johnson, should be dismissed for failure to state a claim for relief.  Defendant Kelley issued a "blanket ban" on all books authored by Robert Greene and seized his copy of "Mastery" on December 10, 2015, despite the fact that it was not included on any NJDOC lists of unauthorized material. Amended Complaint ¶¶ 336–38.  Plaintiff complained about Kelley's action in a letter to Defendant S. Johnson, who never responded, *id.* at ¶ 339, and Defendant Patoe informed him that the book was seized because of its "mind-controlling" content. *Id.* at ¶ 340.  Although Plaintiff asserts that the book was seized "in retaliation for filing a grievance," *id.* at ¶¶ 339, 505, and further asserts that his "complaints and work as an ILA paralegal" were a "substantial motivating factor" for the seizure, *id.* at ¶ 506, these allegations are conclusory and not supported by any well-pleaded facts showing that Plaintiff's complaints/grievances or his work as a paralegal were "substantial or motivating factor[s]" for Kelley's seizure of the book.  *See Rauser*, 241 F.3d at 333.

Nor has he shown that Defendants Patoe, C. Johnson, or S. Johnson were sufficiently involved in any misconduct.  A plaintiff asserting any § 1983 claim against multiple defendants must show that each defendant participated in the alleged deprivation of rights.  *Estate of Smith v. Marasco*, 430 F.3d 140, 151 (3d Cir. 2004).  It appears that Defendants Patoe, C. Johnson, and S. Johnson merely responded (or failed to respond) to Plaintiff's grievances about the incident, and failure to respond to a grievance is not a basis for § 1983 liability.  *Glenn v. DelBalso*, 599 F. App'x. 457, 459 (3d Cir. 2015) (explaining that "[a]ccess to prison grievance procedures is not a constitutionally-mandated right, and allegations of improprieties in the handling of grievances do not state a cognizable claim under § 1983").

For these reasons, the Court will dismiss the First Amendment retaliation claims in Count Four against Defendants Kelley, C. Johnson, S. Johnson, and Patoe arising from the seizure of the book.[12]

### 5.   Count Six—Supervisor Liability as to C. Johnson for First Amendment Retaliation

Defendant C. Johnson moves to dismiss Count Six against her for failure to state a claim for relief. [13]  In Count Six, Plaintiff alleges that Defendant Stromberg created policies that reduced legal services and access in order to prevent Plaintiff from providing legal assistance to inmates through the ILA.  *See* Second Amended Complaint at ¶¶ 348-355.  He asserts that C. Johnson, as well as other supervisory Defendants "have personal knowledge about all policies implemented by Defendant Stromberg and the retaliatory intent behind the policies" and "failed

---

[12] Count Five, alleging a separate First Amendment claim based on the improper seizure of the book, is discussed separately below.

[13] Count Six also asserts First Amendment retaliation claims against Defendants Stromberg, Sisnetsky, Williams, S. Johnson, Chetirkin, and Maines in connection with the reduction of legal services at NJSP.  The Court addresses Count Six as to Defendant C. Johnson only.

to supervise Defendant Stromberg and train her against taking retaliatory action for protected speech." *See id.* at ¶¶ 352-353.  Other than these conclusory allegations, there are no well-pleaded facts or exhibits to support Plaintiff's assertions that C. Johnson had knowledge of Stromberg's policies and her alleged retaliatory intent or that C. Johnson failed in any duties to supervise and train Defendant Stromberg.  As such, the Court will grant the motion to dismiss Count Six as to Defendant C. Johnson only.

### 6.  Count Seven—First Amendment Retaliation

State Defendants Jensen, DeJesus, Harris, Samosuk, and Patterson seek dismissal of Count Seven, alleging First Amendment retaliation in connection with seizing and/or opening Plaintiff's mail.  Plaintiff asserts that he gave two manila envelopes to Defendant Jensen, but Jensen failed to provide the envelopes containing his personal photos and legal documents to his family members.  Second Amended Complaint at ¶¶ 382–88.  Plaintiff later learned his family received some but not all of the materials in the envelopes. *Id.* at ¶ 389.  Plaintiff believes that Defendant Jensen read and seized his mail to retaliate against him for filing this lawsuit and for "trying to bring about social change" as an ILA paralegal. *Id.* at ¶¶ 391–93.  Plaintiff later prepared an additional envelope of materials, which Defendants DeJesus and Harris failed to provide to his family. *Id.* at ¶¶ 398, 401–402, 404.  He filed a grievance, and Defendant Patterson provided "no viable explanation" as to why the materials were seized. *Id.* at ¶¶ 402, 404–05, 417.  With respect to his incoming mail, an unknown prison official stamped his ACLU correspondence with the words, "Content Not Approved." *Id.* at ¶¶ 412–13.  In response to Plaintiff's grievance, Defendants Patterson informed him that no one had opened his mail. *Id.* at ¶ 416.  Upon "information and belief," Plaintiff alleges that Patterson herself directed someone to open, read, and stamp the ACLU correspondence. *Id.* at¶ 418.

None of these allegations support a First Amendment retaliation claim against these Defendants.  Although Plaintiff alleges that Defendants Jensen, DeJesus, Harris, and Patterson took these actions to retaliate against him for filing this lawsuit, and for "trying to bring about social change" as an ILA paralegal, *id.* at ¶ 406, there are no well-pleaded facts to suggest these Defendants knew about the instant lawsuit or about Plaintiff's advocacy as a ILA paralegal. Thus, Plaintiff fails to show that his protected activities were "a substantial or motivating factor" for these Defendants' actions.  *See Rauser*, 241 F.3d at 333. Notably, Samosuk was not involved in these incidents at all.[14]  As such, the Court will grant the motion to dismiss as to Jensen, DeJesus, Harris, Patterson, and Samosuk on the First Amendment retaliation claims in Count Seven.

### c.   Count Five – First Amendment Right of Association

In Count Five, Plaintiff asserts a First Amendment claim against Defendants Kelly, Patoe, S. Johnson, and C. Johnson based on the seizure of the book itself.  The Supreme Court has established that prisons can regulate publications for security reasons. *Thornburgh v. Abbott*, 490 U.S. 401, 415 (1989). In *Thornburgh*, the Court upheld a policy that prisoners could receive all subscription publications except those particular publications that prison officials determined, after individual review, had content that undermined security.  490 U.S. at 404.  To analyze plaintiff's First Amendment claim, courts apply the Supreme Court test in *Turner v. Safley*, 482 U.S. 78, 89-90 (1987), to determine "whether a prison regulation is reasonably related to

---

[14] In light of his pro se status, the Court liberally construes Plaintiff to assert a First Amendment retaliation claim against Samosuk, in which Samosuk fired Plaintiff from his position as a ILA paralegal immediately after Plaintiff's successful representation of an inmate at a 2017 disciplinary hearing.  *See* Second Amended Complaint at ¶¶ 132-135; *see also* ¶¶ 439-447. Defendants do not discuss this claim, having confined their analysis to the explicit Counts in the Second Amended Complaint.

legitimate penological interest." Here, Plaintiff asserts that Kelley seized the publication without review of its contents and that the proffered reason for the seizure of the book is inconsistent with NJDOC policy. Defendants have not analyzed the *Turner* factors, and the Court declines to dismiss the First Amendment association claim against Kelley at this early stage of the proceedings.

The Court will dismiss the claims against Patoe, S. Johnson, and C. Johnson, as their involvement is limited to responding (or failing to respond) to Plaintiff's grievances about the book's seizure, which is insufficient to state a claim for relief under § 1983. *See, supra*, *Glenn*, 599 F. App'x. at 459.

### d. Count Eight -- Due Process Claims

State Defendants next seek dismissal of Count Eight of the Second Amended Complaint as to Defendants Williams, Stromberg, and Sisnetsky. Count Eight asserts violations of Plaintiff's Fourteenth Amendment right to due process in connection with the seizure of Plaintiff's "legal documents, legal mail, and legal material" without providing written notice of the items seized and without granting him access to a "reasonable post-deprivation process[.]" Second Amended Complaint at ¶¶ 520–21. Count Eight is asserted against "Defendants Payne, D'Amico, Kennedy, Stromberg, Sisnetsky, Williams, Chetirkin, Somma, Melendez, Schlusselfeld, Jensen, DeJesus, Harris, and Patterson[.]" *See id.*

It is well established that "[p]risoners ... may not be deprived of life, liberty or property without due process of law." *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). State Defendants assert, however, that the Second Amended Complaint fails to allege that Defendant Williams seized any legal documents, legal mail, or legal materials from Plaintiff, and they further assert that Defendants Stromberg and Sisnetsky only seized items belonging to the ILA—items that

were not Plaintiff's personal property.  Other than the conclusory allegation in Count Eight, there

are no well-pleaded factual allegations in the Second Amended Complaint showing that

Defendant Williams seized any property from Plaintiff.  The Second Amended Complaint asserts

that Stromberg and Sisnetsky seized legal preparation items from ILA office in July 2016 and

that some of the seized items had been donated to the ILA by Plaintiff and other inmates.  *See*

Second Amended Complaint at ¶¶ 372-377.  There are no well-pleaded facts to suggest that

Defendants Stromberg or Sisnetsky seized legal documents, legal mail, and legal material (or any

other property) belonging to Plaintiff personally.  As such, the Court will grant the motion to

dismiss Count Eight as to Williams, Stromberg, and Sisnetsky only.

   **e.  Count Eleven—Access to the Courts**

   State Defendants next assert that Plaintiff fails to state a First Amendment claim for

denial of access to the courts, as pleaded in Count Eleven.  Prisoners must be allowed "adequate,

effective and meaningful" access to the courts.  *See Bounds v. Smith*, 430 U.S. 817, 822 (1977)

(holding that prisons must give convicted inmates access to law libraries or direct legal

assistance).  Thus, prison authorities must, for example, "assist inmates in the preparation and

filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate

assistance from persons trained in the law." *Bounds*, 430 U.S. at 828.

   There are two general types of access to the courts claims.  In the first type

> the essence of the access claim is that official action is presently
> denying an opportunity to litigate for a class of potential plaintiffs.
> The opportunity has not been lost for all time, however, but only in
> the short term; the object of the denial-of-access suit, and the
> justification for recognizing that claim, is to place the plaintiff in a
> position to pursue a separate claim for relief once the frustrating
> condition has been removed.

*Christopher v. Harbury*, 536 U.S. 403, 413 (2002).  In the second type, the prisoner asserts that

the defendants' actions have inhibited his opportunity to present a past legal claim and must

show (1) he suffered an actual injury—that is, that he lost a chance to pursue a "nonfrivolous" or "arguable" underlying claim; and (2) he has no other "remedy that may be awarded as recompense" for the lost claim other than in the present denial-of-access suit.  *Id.* at 415; *see also Monroe v. Beard*, 536 F.3d 198, 205 (3d Cir. 2008); *Oliver v. Fauver*, 118 F.3d 175, 177 (3d Cir. 1997) (plaintiff must demonstrate "actual injury ... such as the loss or rejection of a legal claim.").  In addition to these requirements, an access to the courts claim brought by a convicted prisoner must relate to either a direct or collateral challenge to the prisoner's sentence or conditions of confinement.  *Lewis*, 518 U.S. at 355 ("Impairment of any other litigating capacity is simply one of the incidental ... consequences of conviction and incarceration.").

Here, Plaintiff asserts that he is threatened with the continued loss of his legal materials and the ability to work in the ILA at NJSP.  In light of his transfer from NJSP to East Jersey State Prison, this claim appears moot.  Plaintiff also has not adequately pleaded that the loss of a meritorious legal claim, as required for the second type of access to the courts claim.  The current civil rights action is still pending, and Plaintiff's second PCR and federal habeas case are likewise still pending.

For these reasons, the Court will grant the motion to dismiss and dismiss without prejudice the access to the courts claims in Count Eleven <u>as to all Defendants</u>.

### f.  Counts Nine and Ten—Supervisory Claims Against Defendant Lanigan

State Defendants also seek dismissal of the supervisory claims against former NJDOC Commissioner Lanigan.  Although "'[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*,'" *Bistrian v. Levi*, 696 F.3d 352, 366 (3d Cir. 2012) (quoting *Iqbal*, 556 U.S. at 696), there are two general ways in which a supervisor can be held liable for his own actions under 42 U.S.C. § 1983.  First,

a supervisor can be held liable when with "deliberate indifference to the consequences," he establishes or maintains "a policy, practice, or custom which directly cause[s] [a] constitutional harm." *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) (citing A.*M. v. Luzerne County Juvenile Det. Ctr.*, 372 F.3d 572 (3d Cir. 2004)), overruled on other grounds by *Taylor v. Barkes*, 135 S. Ct. 2042 (2015).  Second, a supervisor may be personally liable under § 1983 if he "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, has knowledge of and acquiesced in the subordinate's unconstitutional conduct." *Id.* (citations omitted).  Generally speaking, "failure to train" claims for relief are considered a subcategory of "policy or practice liability." *Id.* (citation omitted).  In a policy or failure to supervise/train claim, plaintiff must identify "a supervisory policy or practice that the supervisor failed to employ," and provide facts suggesting that:

> (1)    the policy or procedure in effect at the time of the alleged injury created an unreasonable risk of a constitutional violation;
>
> (2)    the defendant-official was aware that the policy created an unreasonable risk;
>
> (3)    the defendant was indifferent to that risk; and
>
> (4)    the constitutional injury was caused by the failure to implement the supervisory practice or procedure.

*Id.* at 317.

In Counts 9 and 10 of the Complaint, Plaintiff asserts that Defendant Lanigan "maintained a policy, custom, and/or practice of permitting punishment for inmates who engage in oral and written complaints, filing lawsuits, and working as ILA paralegals engaging in good faith litigation to bring about social change, in violation of the First Amendment." *See* Second Amended Complaint at ¶ 532.  Based on the allegations in the Second Amended Complaint, the Court liberally construes Plaintiff to assert a supervisory claim against Defendant Lanigan based on the failure to train and supervise staff and develop policies to prevent First Amendment

retaliation 1) against inmates for their filing of grievances and lawsuits and 2) against prison paralegals/representatives who assist other inmates with their legal issues as part of their job duties.  *See* Second Amended Complaint  at ¶¶ 470-476.

In order to proceed on this type of claim, Plaintiff would need to provide some facts showing that Defendant Lanigan, who is a remote supervisory official, knew of the inadequacies in training, supervision, or policy-making and failed to act.  At this early stage, Plaintiff has provided such a factual basis through his letters to Defendant Lanigan.  On April 1, 2017, Plaintiff wrote a letter to Defendant Lanigan to request him to "constrain staff in NJSP from punishing inmates for using the remedy system and filing lawsuits."  *See* ECF No. 25 at 130-131. Plaintiff's letter described his alleged retaliatory firing from the ILA by Defendant Samosuk. Plaintiff also informs Defendant Lanigan that such retaliation against ILA paralegals has become "customary at NJSP."  *See id.* at 144. On January 15, 2018, Plaintiff wrote again to Defendant Lanigan regarding alleged First Amendment retaliation by Defendant Stromberg in connection with the closing of the ILA offices.  The letters plausibly suggests that Defendant Lanigan may have had actual notice of a pattern of retaliatory conduct against Plaintiff.  As such, the Court declines to dismiss Plaintiff's claim for supervisory liability against Defendant Lanigan arising from the lack of adequate policies and/or supervision/training to prevent NJSP staff from retaliating against prisoners for their protected activities.[15]

---

[15] State Defendants have <u>not</u> moved to dismiss Count 10 against the remaining supervisory defendants,  Norris, S. Johnson, Gramp, Chetirkin, Maines, and Hicks and the Court does not address these claims.  Nor have Defendants moved to dismiss Count 9, which alleges that S. Johnson, Gramp, Chetirkin, Maines, Norris, and Hicks failed to train, supervise, and discipline all the individually named NJDOC employees assigned to NJSP under their command.  *See* Second Amended Complaint at ¶¶ 525-530.

The Court will grant the motion to dismiss the supervisory liability claim against Defendant Lanigan arising from his introduction of the "Corrective Action Form" in 2011, which in turn led to a "customary practice" of NJDOC staff refusing to answer inmates' grievances. *See* Second Amended Complaint at ¶¶ 454–61.  Plaintiff's allegations concerning the "Corrective Action Form" fail to state a plausible claim for relief against Defendant Lanigan because Plaintiff has no constitutional right to an effective grievance system.[16]  *See Glenn v. DelBalso*, 599 F. App'x. at 459 (explaining that "[a]ccess to prison grievance procedures is not a constitutionally-mandated right, and allegations of improprieties in the handling of grievances do not state a cognizable claim under § 1983").[17]  Plaintiff's allegations that the Corrective Action Form somehow promotes First Amendment retaliation by prison officials is speculative and conclusory.

The Court will also dismiss Plaintiff's supervisory liability claim premised on Lanigan's creation of a training class entitled "Inmate Manipulation." *Id.* at ¶ 463.  Plaintiff asserts that Defendant Lanigan "promulgated and created a Training Class for all NJDOC employees referred to as 'Inmate Manipulation'" and that the class was designed to "to teach each NJDOC

---

[16] Although Plaintiff's allegations about the inadequacy of the grievance system at NJSP is not cognizable as a claim for relief, these allegations are relevant to issue of exhaustion, and Plaintiff is free to argue that the failure to respond to specific grievances forecloses the State from asserting that he failed to exhaust. *See* 42 U.S.C. § 1997e(a)

[17] Defendants also assert that Defendant Lanigan created the Corrective Action Form in his "official capacity", and thus a claim for damages is not cognizable. *See* Defendants' Brief at 57-58.  The Court dismissed the official capacity claims for damages against all Defendants, including Defendant Lanigan, but disagrees that all claims against Defendant Lanigan arising from his official acts as Commissioner are "official capacity" claims.  Indeed, the holding of *Hafer v. Melo*, 502 U.S. 21, 31 (1991), on which State Defendants rely, states the opposite: "We hold that state officials, sued in their individual capacities, are "persons" within the meaning of § 1983. The Eleventh Amendment does not bar such suits, <u>nor are state officers absolutely immune from personal liability under § 1983 solely by virtue of the "official" nature of their acts.</u>"  *See id.* (emphasis supplied).  As such, the Court rejects this argument in favor of dismissal.

employees [sic] to be mistrustful and indifferent to inmate complaints and grievances[]" and "caused NJDOC to retaliate against inmates for speech protected by First Amendment to the United States Constitution." *See id.* The Court credits Plaintiff's allegations that the course was created by Lanigan and one of its objectives is to teach NJDOC employees to be mistrustful and indifferent to inmate complaints and grievances, but it is unclear how such a course would cause NJDOC employees to retaliate against prisoners for filing grievances or other complaints. Because the Court finds it speculative that the training class contributed to the alleged constitutional violations complained of by Plaintiff, it will grant the motion to dismiss on this claim.

Finally, Plaintiff alleges that Lanigan failed to inform NJDOC staff of the restrictions against "at will seizure" of inmates' mail and other personal items. *Id.* at ¶ 465. The Court will grant the motion to dismiss this claim because Plaintiff has provided no facts showing that Defendant Lanigan knew that NJDOC staff was seizing inmates mail or personal items or that more training and supervision or better policies were needed.[18]

### g. Plaintiff's Request to Expunge his Disciplinary Adjudication

In his lengthy list of requests for relief, Plaintiff asks the Court to expunge his disciplinary adjudication. Defendants make a number of alternative arguments in support of their claim that Plaintiff may not expunge his disciplinary proceeding results through a § 1983 action, but they acknowledge that the relevant facts about this disciplinary proceeding, including whether Plaintiff appealed this determination, are outside the four corners of the Complaint. *See* Defendants' Brief at 63-67. Having denied without prejudice the motion to dismiss on the basis of *Heck*, the Court also denies without prejudice the motion to dismiss Plaintiff's request to

---

[18] Count Five is likewise dismissed as to Defendant Lanigan for the same reason.

expunge his disciplinary adjudication because the necessary facts are outside the Complaint. State Defendants may renew this motion at summary judgment with the full record and appropriate briefing.

### h. Plaintiff's Claims for Injunctive Relief

State Defendants also seek dismissal of Plaintiff's claims for injunctive relief.  Here, the allegedly faulty policies and reductions of legal access of which Plaintiff complains apply exclusively to NJSP in Trenton, New Jersey.  In addition, all of the named defendants alleged to have seized Plaintiff's mail and/or legal documents and retaliated against him for his grievances, lawsuits, and job duties are employees or former employees at New Jersey State Prison.  *See id.* at 4–9, ¶¶ 12–43.  Because Plaintiff now resides at EJSP in Rahway, *see* ECF No. 66, he is no longer subject to any of the above policies or customs, and he is no longer forced to interact with the named defendants.  Thus, his various requests for injunctive and declaratory relief are moot. *Sutton v. Rasheed*, 323 F.3d 236, 248 (3d Cir. 2003) ("An inmate's transfer from the facility complained of generally moots the equitable and declaratory claims.").  The "capable of repetition" doctrine provides a narrow exception to the mootness principle.  As explained by the Third Circuit in *Abdul-Akbar v. Watson*, 4 F.3d 195, 206 (3d Cir. 1993).  The "capable of repetition" doctrine . . . is limited to cases presenting two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable likelihood that the same complaining party would be subjected to the same action again." (citing *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)).  Both elements are not present in this action.  The Court will therefore grant the motion to dismiss Plaintiff's claims for injunctive relief at this time.

IV.    **CONCLUSION**

The motions to dismiss, ECF Nos. 70, 75, 80, are granted in part and denied in part as explained in this Opinion.  An appropriate Order follows.


DATED:  August 28th 2020

Freda L. Wolfson
U.S. Chief District Judge